Jerry J. ALEXANDER, Appellant–
Respondent,

v.

Susan C. ALEXANDER,
Appellee–Petitioner.

No. 79A02–0906–CV–528.

Court of Appeals of Indiana.

May 20, 2010.

Cynthia Phillips Smith, Lafayette, IN, Attorney for Appellant.

Carolyn S. Holder, Holder and Fehrenbach, Lafayette, IN, Attorney for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Respondent, Jerry J. Alexander (Jerry) appeals the trial court's amended disposition decree issued pursuant to the dissolution of his marriage to Appellee–Petitioner, Susan C. Alexander (Susan), and Susan cross-appeals.

We affirm in part, and remand for further proceedings.

### ISSUES

Jerry presents three issues for our review, which we restate as the following issue: Whether the trial court abused its discretion or committed clear error when valuing the property of the marriage and then distributing it.

Susan presents two issues in her cross-appeal, which we restate as the following issue: Whether the trial court abused its discretion or committed clear error when valuing the marital property and then distributing it.

### FACTS AND PROCEDURAL HISTORY

On June 12, 1976, Jerry and Susan were married. During their marriage, they had three children, all of whom are emancipated. They also accumulated a significant amount of property, both real and personal. On December 19, 2007, they separated, and on December 28, 2007, Susan filed a petition for the dissolution of their marriage in Tippecanoe County, Indiana. Both Jerry and Susan resided in Boone County, Indiana, but Jerry submitted to the jurisdiction of Tippecanoe County.

During the pendency of their divorce, Susan and Jerry had numerous disputes which they brought to the attention of the trial court. They attempted to resolve their differences through mediation, but were unsuccessful. On December 16, 2008, the trial court began a two day trial where the parties presented competing evidence regarding the valuation of their property. On February 5, 2009, the trial court entered findings of fact and conclusions of law at the parties' request dissolving their marriage and detailing the distribution of the marital property. On March 4, 2009, Susan filed a motion to correct error, and on March 6, 2009, Jerry filed his motion to correct error. The trial court conducted a unified hearing on the motions on March 26, 2009. The trial court granted in part, and denied in part the motions to correct error and issued amended findings of fact and conclusions of law, which provided in pertinent part:

7. [Jerry] and [Susan] operated Alexander and Associates Real Estate, Inc. [ (Alexander and Associates) ] during the course of their marriage. The business is operated as a franchise of Century 21 Realty Group Alexander. The business is located in Lebanon, Indiana.

8. [Jerry] is the sole share holder of Alexander and Associates [ ].

\* \* \*

10. [Susan] obtained [a] valuation report by Michael Strauch, valuing Alexander and Associates [ ] at $288,600.00.

11. [Jerry] obtained an appraisal of Alexander and Associates [ ] by Michael Stover [ ]. Stover valued the business at $35,800.00.

\* \* \*

13. The business appraisals disagreed in several areas, best summarized as follows: (1) Strauch eliminated all of the interest expenses incurred by the corporation, and Stover found the expenses to be legitimate expenses (2) Strauch increased the cash flow of the business, and Stover used the actual Federal Income Tax Returns filed by the parties to reflect the expenses and income of the business.

\* \* \*

22. The [c]ourt accepts Stover's valuation except the 85% reduction value for negative cash flow.

23. The [c]ourt determines that the appropriate reduction is 50%, and accordingly, the [c]ourt values Alexander and Associates [ ] at $119,475.00.

24. [Jerry] is the sole shareholder of Development Corporation of Indiana that owns the commercial real estate located at 1121 S. Lebanon Street, Lebanon, Indiana, and known as the Enterprise Car Leasing Property.

25. Development Corporation of Indiana also has [a] Property Management/Leasing Agreement with William E. Daniels, dated January 1, 2002.

26. Strauch valued the Daniels Property Management Agreement between William E. Daniels and Development Corporation of Indiana at the sum of $199,208.00. Strauch assumed the monthly income to be $2,000.00 and did not take into account any expenses of the management of the Daniels Property Management Agreement.

\* \* \*

33. [Jerry] retained Michael Stover [ ] to value the Daniels Contract. Stover determined the Contract had no present value.

\* \* \*

35. Stover found the compensation received by [Jerry] is similar to compensation that an employee or independent contractor would receive, and therefore it should be classified as income received by [Jerry], not a present value asset of the marriage.

36. The [c]ourt adopts the finding of Stover and determines that there is no present value of asset to be assigned to the Daniel Property Management Agreement.

37. [Susan] owns a five percent limited partnership interest in Bush and Bush Farms [ ], gifted to [her] by [her] parents, James and Christina Bush, during the marriage of the parties. All partners in said partnership are related to [Susan].

38. The total acreage owned by Bush and Bush Farms [ ] is 1,338.65 acres.

39. The Court finds that the following factors impact the value of [Susan's] limited partnership interest:

a. [T]he Bush Farms Partnership Agreements specifically provide [ ] that a limited partner cannot bring an action for partition to force the sale of land.

b. The general partners, James and Christina Bush, [Susan's] parents, have full control over the company and [Susan] has no decision making ability.

c. For any action upon which the limited partners are allowed to vote, 90% of the limited partners

must agree before any action can be taken.

d. Before a limited partner can sell to an outsider, the ownership interest of the limited partner must be offered for sale by the other partners.

e. A new limited partner who is assigned the limited partner's interest has no right to inspect the books, vote or obtain any information about the partnership.

f. Modification of the partnership agreement requires 90% of the limited partner's approval plus obtaining the general partners approval.

40. Michael Strauch [ ] valued [Susan's] interest in Bush and Bush Farms [ ] at $152,100.00 as of December 31, 2007.

41. The 25% minority discount for lack of control and the 15% marketability discount used by Mr. Strauch in establishing the value of [Susan's] interest in Bush and Bush Farms [ ] are justified and are supported by the facts in this case.

42. Mr. Strauch used an incorrect amount of acreage, and based his evaluation of the partnership on Mr. Bush's assessment of the real estate at $4000 per acre, and used a value of $5,320,000.00 for the land and improvements.

43. Mr. Strauch determined the other partnership assets to be cash of $116,000.00 and machinery and equipment of $44,800.00

44. Appraiser Jeffrey Wolf[e] testified that the land and improvements owned by Bush and Bush Farms [ ] is worth $8,289,500.00.

\* \* \*

47. The [c]ourt accepts the method of valuation used by Michael Strauch but not his value of the land and improvements.

48. [T]he [c]ourt determines that [Susan's] interest in Bush and Bush Farms[,] LP is $253,670.00.

49. [Jerry] is the owner of 10 acres located in Montgomery County, Indiana which he acquired from his family.

50. The parties own 2.5 acres of real estate that give road access to that 10 acre tract.

51. [ ] The [c]ourt assigns a value of $125,000.00 to the property.

52. The real estate located in Montgomery County should be set over to [Jerry] and [Susan] shall have no further interest therein.

53. The 2006 Federal Income Tax Refund of $15,323.00 from the jointly filed income tax return is being set over to [Jerry] because he applied that refund to his 2007 Federal Income Tax obligation.

54. [Jerry] purchased a microwave tower property, located on Cozy Lane, which has no value.

\* \* \*

56. The parties own 2 billboards near interstate 65 which were valued at $24,000.00 by Mr. Strauch and by Mr. Wolf at $13,500.00.

57. The [c]ourt determines the value of the billboard property to be $13,500.00.

58. The parties own a time share condominium in Mexico for 2 weeks each year. The parties shall each have one week of occupancy at the time share each year, with [Jerry] having the first week during 2009 and [Susan] having the first week in 2010 and alternating each year thereafter.

59. The parties own real estate located at 11411 North Michigan Road, Zions-

ville, Indiana for which they have accepted an offer to purchase.

60. The closing on said real estate is set for spring of 2009.

\* \* \*

63. [Susan] shall have the residential real estate located at 525 West 450 South, consisting of the residence and one acre, plus the four additional lots located adjacent to or near the residence, all in Harrison Township, Boone County, Indiana, set over to her as her separate property and [Jerry] shall have no further interest therein. [ ]

\* \* \*

65. The parties owned and sold real estate located at 415 N. West Street, Lebanon, Indiana, for $67,111.00, which was deposited into Alexander and Associates Company Account and was consumed in its entirety for business purposes.

66. Pursuant to the agreed order of November 21, 2008, furniture was sold that had been located at the parties' Zionsville office.

## DISSOLUTION DECREE

\* \* \*

4. The [c]ourt divides the parties' assets as follows:

To [Jerry]

I. Real Estate

| | | |
|---|---|---|
| A. | 1338 S. Lebanon Street | $ 290,000.00 |
| B. | Enterprise Building | 160,000.00 |
| C. | 1117 S. Lebanon Street (rental) | 60,000.00 |
| D. | Montgomery County Property (12.25 acres) | 125,000.00 |

II. Business Interests

| | | |
|---|---|---|
| A. | Alexander and Associates | 119,475.00 |
| B. | Microwave Tower | 0.00 |
| C. | Daniels Plaza Property (Management Contract) | 0.00 |

III. Personal Property

| | | |
|---|---|---|
| A. | 1997 Ford Van | 3,500.00 |
| B. | 1993 Ford Van | 2,500.00 |
| C. | 2005 Honda Motorcycle | 11,800.00 |
| D. | 2002 GMC Yukon | 8,950.00 |
| E. | 1999 Cargo Utility Trailer | 1,500.00 |
| F. | 2002 Dodge Ram | 9,000.00 |
| G. | 1994 GMC Sierra | 4,075.00 |
| H. | 2006 Polaris RV | 4,250.00 |
| I. | 1993 IHC Dump Truck | 7,500.00 |
| J. | 1999 Backhoe Trailer | 4,250.00 |
| K. | Backhoe, Case 580 | 6,500.00 |
| L. | 2006 Polaris RV 4 × 4 | 4,250.00 |
| M. | 1999 Mercedes E55 | 14,400.00 |
| N. | 2003 Motorcycle Trailer | 1,800.00 |
| O. | 2004 Cargo Mate 16' Trailer | 2,750.00 |
| P. | 1989 Utility Trailer 12' | 700.00 |
| R. | Polaris Wave Runner (3) and 2003 Trailer | 7,325.00 |
| S. | 1995 Sea Ray Boat and Trailer | 7,000.00 |
| T. | 1994 Ranger Bass Boat and Trailer | 4,000.00 |
| U. | Gehl 6625 SX Skid Loader | 4,800.00 |
| V. | [Jerry's] jewelry | 3,785.00 |
| W. | [Jerry's] guns | 5,660.00 |

IV. Accounts and Insurance

| | | |
|---|---|---|
| A. | Famers Bank [ ] | 5,492.00 |
| B. | Old National Bank [ ] | 2,989.00 |
| C. | Fifth Third Bank [ ] | 1,302.00 |
| D. | Chase [ ] | 2,444.00 |
| E. | Key Bank [1] | 12,030.00 |
| F. | Key Bank [2] | 96.00 |
| G. | Key Bank [3] | 1,096.00 |
| H. | NCB checking [ ] | 20,518.00 |
| I. | NCB savings [ ] | 101,008.00 |
| J. | Lizton checking [1] | 1,020.00 |
| K. | Lizton checking [2] | 2,263.00 |
| L. | Prudential Annuity [ ] | 19,584.00 |
| M. | Midland [ ] | 29,369.00 |
| N. | HAS Medial [ ] | 22,807.00 |
| O. | Sammons [ ] | 11,853.00 |
| P. | Sammons [ ] | 107,947.00 |
| R. | AXA [ ] | 28,703.00 |
| S. | AXA [ ] | 20,762.00 |

| | |
|---|---|
| Total | $1,266,053.00 |

To [Susan]

I. Real Estate

| | | |
|---|---|---|
| A. | Marital Residence and four adjacent lots | $345,000.00 |
| B. | North Farm | 118,000.00 |
| C. | Billboard Properties | 13,500.00 |
| D. | Rich Farm | 197,750.00 |

II. Business Interests

| | | |
|---|---|---|
| A. | Bush & Bush Farms | 253,670.00 |

III. Personal Property

| | | |
|---|---|---|
| A. | 2001 Mercedes E430 | 13,250.00 |
| B. | [Susan's] jewelry | 3,785.00 |
| C. | [Susan's] fur coat | 1,050.00 |
| D. | [Susan's] inherited items | 670.00 |
| E. | Personal property at [Susan's] Zionsville residence | 3,784.00 |
| F. | Property from Zionsville Office in [Susan's] possession | 1,309.50 |
| G. | Century 21 Office—Zionsville | 10,535.00 |

IV. Accounts and Insurance

| | | |
|---|---|---:|
| A. | Eli Lilly Stock | 5,495.00 |
| B. | Midland Annuity [ ] | 182,974.00 |
| C. | Sammons [ ] | 84,304.00 |
| D. | AXA [ ] | 4,115.00 |
| E. | AXA [ ] | 20,154.00 |
| | **Total** | **$1,259,345.50** |

5. The [c]ourt finds that it is fair and equitable to include [Susan's] 5% interest in Bush and Bush Farms [ ] as a marital asset. [ ]

6. [Jerry's] contract with Daniels Plaza is future income, and it is not a marital asset under Indiana law.

\*　　\*　　\*

10. Each party shall receive one half (1/2) of the proceeds ($4,771.84) of the Zionsville office furniture being held in escrow by [Susan's] attorney.

11. [Jerry] shall receive as his sole and separate property the 2007 tax credit in the sum of $15,323.00 and [Susan] shall have no further interest therein.

12. The $11,734.00 balance of the Key Bank Line of Credit [ ] and the expenditure of $63,019.00 from that account for maintenance, for a total of $74,753.00, shall be paid from the proceeds of the sale of the Zionsville Office.

13. The NCB Line of Credit [ ] ($499,-482.00) the Mortgage [ ] ($411,494.00), and the Mortgage on 1117 S. Lebanon Street ($62,618.00) shall be paid from the proceeds of the sale of the Zionsville Office.

14. The parties shall equally divide any excess or deficiency arising from the sale of the Zionsville Office and payment of debts.

15. As such debts are connected with [Jerry's] business, [Jerry] shall pay as it becomes due and owing and hold [Susan] harmless on the indebtedness to AAA Credit Car [d]—Key [ ] ($6,003.00), the equipment lease for copiers [ ] ($34,-534.00), and all indebtedness of the Key Bank Line of Credit [ ] in excess of $74,753.00.

16. [Susan] is entitled to one half of the $67,111.00 received by [Jerry] for the sale of 415 N. West Street Lebanon, Indiana.

17. [Susan] is entitled to receive one half of the $15,323.00 Federal Tax Refund which has been credited to [Jerry].

18. To equalize the debt owed under paragraphs 16 and 17 above, [Jerry] owes [Susan] $41,217.00.

19. To equalize the property distribution set out in paragraph 4 above, [Jerry] owes [Susan] $3,353.75. [Jerry] shall pay to [Susan], in full and final settlement of the parties' property rights, the sum of $44,570.75, payable at the earliest of the closing of the sale of the Zionsville Office, or ninety (90) days.

(Appellant's App. pp. 41–63).

Jerry and Susan both now appeal. Additional facts will be provided as necessary.

### DISCUSSION AND DECISION

#### I. *Standard of Review*

■■■ The parties are challenging the trial court's distribution of property. The division of marital assets is within the trial court's discretion, and we will reverse only for an abuse of that discretion. *DeSalle v. Gentry*, 818 N.E.2d 40, 44 (Ind.Ct.App. 2004). The parties must overcome the presumption that the trial court considered and complied with the applicable law, and that presumption is one of the strongest presumptions applicable to our consideration on appeal. *Id.* We may not reweigh the evidence or judge the credibility of the witnesses, and we consider only the evidence most favorable to the trial court's disposition of the marital property. *Id.*

■■■ Additionally, the parties are appealing from a decision where the trial

court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52. Therefore, we will first determine whether the evidence supports the findings and second, whether the findings support the judgment. *Webb v. Webb*, 868 N.E.2d 589, 592 (Ind.Ct.App.2007).

> The trial court's findings and conclusions will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. We neither reweigh the evidence or assess the credibility of the witnesses, but consider only the evidence most favorable to the judgment.

*Id.* (citations omitted).

## II. *Jerry's Appeal of the Property Distribution*

### A. *Alexander and Associates Realty Company*

■ Jerry contends that the trial court erred by assigning a value of $119,475.00 to Alexander and Associates.[1] The trial court's Order acknowledged the disparity between Susan's proposed value of Alexander and Associates and Jerry's proposed valuation, both supported by expert testimony. The trial court adopted Jerry's proposed valuation as the starting point for valuing that asset, but then deviated from Jerry's expert by concluding that a 50% discount should be applied for negative cash flow instead of the 85% discount proposed by Jerry's expert.

Jerry cites to *Axsom v. Axsom*, 565 N.E.2d 1097 (Ind.Ct.App.1991), in an at-

tempt to characterize the trial court's valuation of Alexander and Associates as being unsupported by any evidence. In *Axsom*, the trial court heard expert testimony that the husband's barber shop business was worth approximately $30,470.00, which was the only evidence of a dollar value placed upon the barber shop business. *Id.* at 1100. The trial court heard other evidence regarding the barber shop, including the number of beauticians that had worked in the husband's barber shop and the amount of rent that they paid per year. *Id.* at 1100–01. Additionally, the expert that valued the business conceded that the process of valuing such a business "is not an exact science." *Id.* at 1101, n. 4. In the trial court's final Order, it assigned a value of $2,000 to the barber shop business. *Id.* at 1100. On appeal we concluded that "[b]ased on the evidence, the court could have discounted the value of the business as not being worth $30,000, but the discrepancy between the court's valuation of the business and the testimony is so far apart that it appears to be an arbitrary determination," and remanded for the trial court to reevaluate the value of the business. *Id.* at 1101.

■ Here, Jerry's expert conceded that his determination that an 85% discount for the negative cash flow of Alexander and Associates was a subjective determination made without any specific authority supporting such a discount. The trial court was presented with evidence concerning the value of Alexander and Associates' franchising with Century 21 and Reality One, and also heard evidence about the general real estate market slow down

---

1. Jerry actually places this argument in a section entitled: "Did the [t]rial [c]ourt commit an abuse of discretion and reversible error by adopting the value of [Susan's] appraisers rather than the value placed on various assets by Husband's appraisers?" However, since the trial court explicitly used Jerry's expert in developing the assigned value for Alexander and Associates, we assume that Jerry intended to argue that the trial court abused its discretion when it deviated from his expert's valuation.

which likely accounted for the negative cash flow for the business. If we were to apply our decision in *Axsom* to this evidence alone, the trial court would have discretion to deviate from Jerry's expert's valuation. However, different from *Axsom*, the trial court was presented with a second expert opinion that advanced a competing valuation. This expert opined that no discount for negative cash flow should be applied at all. "A valuation submitted by one of the parties is competent evidence of the value of property in a dissolution action and may alone support the trial court's determination in that regard." *Houchens v. Boschert*, 758 N.E.2d 585, 590 (Ind.Ct.App.2001), *trans. denied*. Therefore, we conclude that the trial court has not abused its discretion by determining that Alexander and Associates was worth $119,475.

### B. *Montgomery County Property*

 Jerry argues that the trial court erred by assigning a value of $125,000 to approximately 12.25 acres that he owns in Montgomery County and by failing to set aside that property as being separate from the property of the marriage. Jerry was deeded approximately 10 acres of that property when his mother died in 1977, during the parties' marriage. Sometime thereafter, Jerry purchased 2.25 acres to preserve easement rights to the property.

Susan had Augusta Cronkhite (Cronkhite) perform an appraisal of the property. Cronkhite visited the property and testified for the court about its characteristics. According to Cronkhite, the highest and best use of the property would be for recreation because the majority of the property is situated in the flood plain of Sugar Creek, which actually cuts the property in two. There exists a large garage affixed to the property and there was a manufactured home located upon it as well. Cronkhite was unable to view the interior of the manufactured home, but walked through the garage, which has electricity and plumbing, including a finished bathroom and furnace. The garage also contains a living area with recreational area. Cronkhite also found records of sales for two nearby properties in the Sugar Creek flood plain to use as comparables. Neither of the properties contained improvements. One parcel was 2.43 acres and sold for $20,000, and the other parcel was 9.697 acres, and sold for $120,000. Based on his evaluation of the property and comparable sales, Cronkhite estimated the value of the property to be in the range of $120,000 to $130,000.

Jerry had Jeffrey Wolfe (Wolfe) appraise the property. Wolfe testified that he did not use the comparable sales that Cronkhite had used, but rather used the sales of other lots not located along Sugar Creek. Further, Wolfe appraised the value of the Montgomery County property by determining a value for the 10 acres as if it were connected to road frontage by way of an easement, and then valued the 2.5 acres as a separate piece of property. He assigned a value of $46,000 to the 10 acres and $5,000 to the 2.5 acres.

Jerry contends that the trial court abused its discretion by relying upon Cronkhite's appraisal to determine that the Montgomery County property was worth $125,000. He contends that Susan "ignores the fact that the properties are in a flood plain and that location [a]ffects their value." (Appellant's Reply Br. p. 3). However, to the contrary, Cronkhite used comparable sales of properties that were located in the Sugar Creek flood plain to develop his estimation of value.

 Additionally, Jerry expresses for the first time in his Reply Brief that he owns only a 1/7th interest in the Montgomery County property, with his siblings

owning 6/7ths of the property, but makes no citation to the record. "The law is well settled that grounds for error may only be framed in an appellant's initial brief and if addressed for the first time in the reply brief, they are waived." *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind.2005). Waiver notwithstanding, we cannot find where this fact was presented to the trial court; therefore, the trial court could not have abused its discretion by not taking it into account. Altogether, we conclude that the trial court's determination that the Montgomery County property was worth $125,000 was supported by the testimony from Cronkhite and well within the trial court's discretion. *See Houchens*, 758 N.E.2d at 590.

## C. *Rich Farm*

Next, Jerry contends that the trial court should not have used Susan's expert's valuation of Rich Farms because he used a "limited appraisal" to develop his opinion. (Appellant's Br. p. 15; Reply Br. p. 4). However, Jerry does not explain what a limited appraisal is, how it differs from the appraisal which his expert performed, or why it would be less reliable.

Susan had Stephen Clifford (Clifford) appraise Rich Farms. Rich Farm is an unimproved 37.35 acre tract owned by the parties located in Harrison Township, Boone County. In addition to the 37.35 acre tract, there is a separate 1.03 acre tract owned by the parties in Harrison Township, Boone County, which Clifford appraised along with Rich Farms. Clifford determined the highest and best use of the 37.35 acre tract to be row crop agricultural production, and highest and best use for the 1.03 acres to be a residential building site. Clifford used four comparable sales of agricultural property for comparison pricing for the 37.35 acres and four sales of rural building sites for compa-

rables for the 1.03 acre tract. Clifford appraised the value of the 37.35 acre tract to be $177,500 and the value of the 1.03 acre tract to be $20,500.

Jerry had Wolfe appraise the two tracts. Wolfe estimated that the total value of the two tracts was $460,000 based on comparable sales in Boone County. Susan cross-examined Wolfe regarding some of the properties sold in the comparable sales and Wolfe admitted that the properties were potential sites for commercial development, but stated that all properties in Boone County were potential sites for commercial development. However, some of the properties used for comparison were located on state highways or at intersections, as opposed to Rich Farm, which is located on a county road, supporting an inference that the comparison properties might be more suitable for commercial development than Rich Farm.

The trial court determined that the value of Rich Farm and the 1.03 acre lot was $197,500, essentially adopting Clifford's appraisal values. Through Clifford's testimony and submitted documents, the trial court was presented with ample evidence supporting its conclusion that the two parcels were worth $197,500. Jerry is plainly asking us to reweigh the evidence and find that his expert was more credible than Susan's. This we cannot do. *See Webb*, 868 N.E.2d at 592.

### D. *Bush and Bush Farms*

Jerry contends that the trial court erroneously valued Susan's 5% interest in Bush and Bush Farms to be worth $253,670. Specifically, Jerry contends that the trial court should not have reduced the value of Susan's minority share for lack of control and marketability.

To support his contention, Jerry cites to *Wenzel v. Hopper & Galliher, P.C.*, 779 N.E.2d 30 (Ind.Ct.App.2002), *trans. denied.* In *Wenzel*, we considered valuation

principles applicable to sales of shares in professional corporations. Wenzel had purchased shares in and joined a small law firm. *Id.* at 35. He became dissatisfied after a period and wished to be bought out by the firm. *Id.* The other partners agreed to purchase his shares at the amount he originally paid for them, and pay him a portion of the law firm's contingency fees. *Id.* Wenzel refused the offer and demanded that the law firm file a petition to value his shares pursuant to the Indiana Professional Corporations Act. *Id.* at 36. The law firm commenced an action to determine the value of Wenzel's shares, and after a bench trial the trial court found, among other things, that the value of Wenzel's shares should be discounted by Wenzel's minority status and for lack of marketability. *Id.* at 37.

We noted that a majority of other jurisdictions have rejected the application of minority and marketability discounts when determining the fair value of stock in cases where a majority shareholder or corporation purchases the stock. *Id.*

> Applying a discount is inappropriate when the shareholder is selling [her] shares to a majority shareholder or to the corporation. The sale differs from a sale to a third party and, thus, different interests must be recognized. When selling to a third party, the value of the shares is either the same as or less than it was in the hands of the transferor because the third party gains no right to control or manage the corporation. However, a sale to a majority shareholder or to the corporation simply consolidates or increases the interest of those already in control. Therefore, requiring the application of a minority discount when selling to an "insider" would result in a windfall to the transferee. This is particularly true since the transferring shareholder would expect that the shares would have the same value in her hands as in the hands of the transferee.

*Id.* at 39 (quoting *Hansen v. 75 Ranch Co.,* 288 Mont. 310, 957 P.2d 32, 41 (1998)).

Here, the trial court acknowledged the following restrictions that are applicable to Susan's ownership interest in Bush and Bush Farms:

> a. [T]he Bush Farms Partnership Agreements specifically provide [ ] that limited partner cannot bring an action for partition to force the sale of land.
>
> b. The general partners, James and Christina Bush, [Susan's] parents, have full control over the company and [Susan] has no decision making ability.
>
> c. For any action upon which the limited partners are allowed to vote, 90% of the limited partners must agree before any action can be taken.
>
> d. Before a limited partner can sell to an outsider, the ownership interest of the limited partner must be offered for sale by the other partners.
>
> e. A new limited partner who is assigned the limited partner's interest has no right to inspect the books, vote or obtain any information about the partnership.
>
> f. Modification of the partnership agreement requires 90% of the limited partner's approval plus obtaining the general partners approval.

(Appellant's App. p. 47). From these restrictions on Susan's minority interest, it is apparent that if Susan was required to sell her minority interest to effectuate the distribution of the marital property it would likely be sold to the other owners of Bush and Bush Farms, and not on the open market. In light of these restrictions and our precedent in *Wenzel,* has the trial court appropriately applied minority and marketability discounts to the value of Su-

san's ownership interest in Bush and Bush Farms?

Susan cites to three opinions for the proposition that a "trial court is authorized under Indiana law to apply discounts to business valuations for a minority interest [:]" *Eyler v. Eyler*, 492 N.E.2d 1071 (Ind. 1986); *Frazier v. Frazier*, 737 N.E.2d 1220 (Ind.Ct.App.2000); and *Nowels v. Nowels*, 836 N.E.2d 481 (Ind.Ct.App.2005). (Appellee's Br. p. 18). In *Eyler*, one of the issues addressed was the value assigned to the husband's ownership interest in his business. *Eyler*, 492 N.E.2d at 1073. Our supreme court disapproved of a minority interest discount applied by the trial court, not because minority interest discounts are inappropriate in marital property distribution cases, but rather because the evidence was that "the shares were held in a joint ownership and not burdened by factors which may warrant consideration of the 'minority interest' discount." *Id.* at 1074. In *Frazier*, we acknowledged that the trial court had rejected the application of a marketability discount, and stated that the "trial court was not required to apply [a] non-marketability discount" that was suggested by one party's expert. *Frazier*, 737 N.E.2d at 1224. And in *Nowels*, we acknowledged that among some thirty findings regarding the valuation of the husband's business, the trial court found that the shares of the closely held business "lacked marketability." *Nowels*, 836 N.E.2d at 485. We ultimately concluded that the trial court "was within the bounds of the evidence presented and within the trial court's broad discretion." *Id.* at 487.

None of these opinions give in-depth consideration as to the appropriateness of marketability discounts or minority interest discounts in marriage dissolution proceedings. We can see the arguable connection to the facts here and the facts presented in *Wenzel* because it is likely that someday, one of two things will happen, either Susan will inherent a controlling interest in Bush and Bush Farms from her aging parents or Susan will sell her interest to the controlling interest owners of Bush and Bush Farms, and, at that time, the 5% interest will be worth the fair market value—considerably more than the value which the trial court has applied. Possibly, Susan will sell her ownership interest to her parents the day after the divorce decree becomes final for fair market value. Nevertheless, we conclude that marketability discounts and minority interest discounts can be utilized by a trial court in dissolution proceedings when determining the value of ownership interests such as the interest which Susan holds in Bush and Bush Farms.

First, the trial court's broad discretion when determining the value of property in dissolution proceedings differentiates these circumstances from those in *Wenzel*. See *Quillen v. Quillen*, 671 N.E.2d 98 (Ind. 1996). This broad discretion leads to a more direct and simple evaluation of how the trial court has valued property than was presented in *Wenzel*. In *Houchens*, wife owned a one-third interest in F.B.F., a limited liability company which heat-treated steel. *Houchens*, 758 N.E.2d at 586. Wife and the other owners signed an operating agreement which restricted transfers of ownership by requiring a majority of all non-selling owners to give written consent to any sale of an interest. *Id.* at 587. The trial court utilized the husband's expert's valuation of wife's interest in the property, who testified that the "transfer restrictions had a 'minimal impact on the discounts that were taken and were applied' in his valuation report." *Id.* at 590. We affirmed the trial court's reliance upon husband's expert stating:

A valuation submitted by one of the parties is competent evidence of the value of property in a dissolution action and

may alone support the trial court's determination in that regard. Additionally, we will not reverse a judgment on the basis of conflicting evidence. We therefore find that the trial court's determination that the value of Wife's one-third interest in F.B.F. was $476,000, is not clearly erroneous.

*Id.*

Furthermore, unlike the facts in *Wenzel*, Susan is not now selling her interest in Bush and Bush Farms. Therefore, the trial court is not acting to prevent a windfall to the other owners of Bush and Bush Farms, but is rather attempting to place a value on Susan's interest as she currently holds it.

 And finally, in dissolution proceedings, trial courts are asked to do tasks such as place values on pensions which have vested in possession only, but for which the amount of benefits has yet to be determined. *See, e.g., In re Marriage of Preston,* 704 N.E.2d 1093, 1097–98 (Ind.Ct. App.1999). However, when trial courts do so, they must determine the value of the asset as it is currently held because trial courts cannot divide future earnings of a party in anticipation that they will be earned. *See Berger v. Berger,* 648 N.E.2d 378, 383 (Ind.Ct.App.1995). Similarly, a trial court should be able to determine the present value of a spouse's ownership interest in light of marketability and minority shareholder discounts. Therefore, we conclude that the trial court did not abuse its discretion or commit clear error when applying marketability and minority shareholder discounts to Susan's ownership interest in Bush and Bush Farms.

### E. *Various Personal Property Items*

 Jerry contends that the trial court erred by awarding him various assets because the assets were not property of the marriage and cannot be awarded to him.

The list of assets he provides to support his contention is as follows:

1) 1993 Ford Van Husband donated to YMCA ($2,500.00 value);
2) 2002 Dodge Ram belongs to son ($9,000.00 value);
3) 2004 Cargo Mate 16' Trailer belongs to son ($2,750.00 value);
4) 1989 Utility Trailer 12' belongs to son ($2,750.00 value);
5) Polaris Wave Runner (3) and 2003 Trailer ($7,325.00 value)—[Jerry] only owned one of these and should have been valued at $4,884.00;
6) 1995 Sea Ray Boat and Trailer son owns ($7,000.00 value); and
7) 1994 Ranger Bass Boat and Trailer [Jerry] owns a ½ interest with a partner ($4,000.00 value should have been $2,000.00).

(Appellant's Br. p. 20). Jerry is correct that the trial court's duty is to dispose of the marital property, and the trial court cannot award items in the possession of the parties but actually owned by someone else. *See Schueneman v. Schueneman,* 591 N.E.2d 603, 607 (Ind.Ct.App.1992) (holding that the trial court abused its discretion by awarding to husband his brother's engine stand). However, Susan aptly points out that Jerry had each of these assets appraised for the trial court, and did not present any evidence that he did not own the items to the trial court (excluding number 7). Therefore, the trial court reasonably inferred that this property was marital property, and, without presenting any evidence to the contrary, Jerry cannot now argue on appeal that the trial court abused its discretion by doing so.

With respect to item number 7 on the list, the 1994 Ranger Bass Boat and trailer, Jerry's own expert's appraisal was that the total value was $8,000. Jerry present-

ed evidence that he owned a one-half interest in that boat and trailer, and based on that evidence the trial court valued the portion of the asset distributed to Jerry at $4,000. Therefore, the trial court accepted Jerry's valuation and claimed ownership interest, and Jerry cannot now argue that it abused its discretion by doing so.

### F. Money from the Sale of West Street Real Estate

■■■ Jerry contends that the trial court abused its discretion by ordering him to pay to Susan half of the proceeds he obtained from the sale of real estate located at 415 N. West Street, Lebanon, Indiana (West Street Property). Specifically, Jerry argues that the trial court "double dipp[ed]" because it found that Jerry had used the proceeds of the sale for business expenses and then ordered him to pay one half of the proceeds to Susan. (Appellant's Br. p. 18).

It is uncontested that the West Street Property was marital property. The trial court found that the parties received $67,111.30 from the sale of that property, and that Jerry used that entire amount for business purposes for Alexander and Associates, another asset of the marriage.

■■■ Susan contends that the trial court's order here does not equate to an act of "double dipping" because the West Street Property sold in March of 2008; therefore, the proceeds had to be used to pay expenses sometime thereafter. The parties were finally separated and the dissolution petition was filed by Susan in December of 2007. In dissolution actions, the marital pot generally closes on the date the dissolution petition is filed. *Fuehrer v. Fuehrer*, 651 N.E.2d 1171, 1174 (Ind.Ct.App.1995). Therefore, debts incurred by one party after the dissolution petition has been filed are not to be included in the marital pot. *Id.* Thus, the business expenses that accrued for Alexan-

der and Associates after the sale of the West Street Property were Jerry's expenses. By using the entirety of the proceeds from the sale of marital property to pay those expenses, Jerry was essentially borrowing the portion of those proceeds that belonged to Susan. The trial court was well within its discretion to order Jerry to pay Susan half of the proceeds from the sale of the West Street property.

### G. Liabilities

■■■ Jerry argues that the trial court erred by imposing certain liabilities upon him, but not accounting for his assumption of those liabilities when making its property distribution. Specifically, Jerry contends that he was ordered to pay a copier lease in the amount of $34,534, a line of credit in the amount of $87,000, and a AAA credit card in the amount of $6,003, and the trial court gave him no credit for assuming these liabilities per the divorce.

The trial court found that the copier lease and the AAA credit card were both liabilities of Alexander and Associates, which was awarded to Jerry. Jerry submitted evidence of the value of Alexander and Associates and those liabilities should have reduced the value of that business. Therefore, the trial court accounted for those liabilities when distributing the marital property.

The $87,000 was debt accumulated by Jerry during the pendency of the dissolution proceedings. As we have stated above, generally, the date of the filing of the petition for dissolution closes the marital pot and liabilities accrued after that date are not to be considered when distributing the marital assets and liabilities. *See Fuehrer*, 651 N.E.2d at 1174. Therefore the trial court did not commit clear error or abuse its discretion by ordering Jerry to pay that liability, but not includ-

ing it in the distribution of marital assets and liabilities.

### H. *Distribution of the Property*

■ Finally, Jerry contends that because of the trial court's erroneous valuations of the marital property, the trial court deviated from the presumed equal division of property without providing reason to do so. Indiana Code section 31–15–7–5 provides that "the court shall presume that an equal division of the marital property between the parties is just and reasonable." If the trial court deviates from an equal division, it must state the reasons for doing so. *Helm v. Helm*, 873 N.E.2d 83, 91 (Ind.Ct.App.2007). However, since we have concluded the trial court has not abused its discretion or committed clear error when valuing the property as Jerry has contended, we also conclude that the trial court has not deviated from an equal division of property as Jerry contends.

### III. *Cross–Appeal*

### A. *Jerry's Personal Property*

■ Susan argues that the trial court found that there was $25,169 worth of personal property located at the marital residence which the trial court awarded to Jerry, and that Jerry held $5,867.50 worth of property from the Zionsville business. However, Susan contends, the trial court failed to account for that property in the calculation of the aggregate value of assets distributed to Jerry. Jerry does not dispute this omission in the trial court's distribution of property, but rather contends: "It is clear under Indiana [l]aw that if the [c]ourt determines that a person shall receive their personal property, it is well within the province of the [t]rial [c]ourt to award the same without a dollar value being assigned to the same." (Appellant's Reply Br. p. 9). Jerry does not cite to any authority for this proposition. Even if this proposition is accurate, we cannot adopt

Jerry's assumption that the trial court intended to set this property aside to Jerry without placing a value upon it. The trial court listed this property with the assets of the parties, just as it did personal property in Susan's possession. However, the trial court awarded Susan her personal property in the disposition of the property and counted it as an asset going to her. We cannot assume that the trial court did not intend to do the same with the property in Jerry's possession. Furthermore, we are uncertain that the trial court intended the property in the marital residence to go to Jerry, considering that it awarded the marital residence to Susan. Therefore, we must remand for the trial court to award this property as it sees fit, in accordance with the law.

### B. *Midland Annuity and Prudential Annuity*

■ Susan contends that the trial court erred when it valued the Midland Annuity awarded to her at $182,974.46 and then awarded to Jerry the Prudential Annuity worth $19,584. The $182,974.46 was the value of the Midland Annuity on December 31, 2007. The Prudential Annuity was opened after the valuation date of the Midland Annuity apparently by both parties by using approximately $18,000 from the Midland Annuity. Therefore, Susan contends that the trial court should have valued the Midland Annuity at $164,783.33, and awarded her both the Midland Annuity and the Prudential Annuity.

■ However, as we have stated above, generally, the marital pot closes as of the date of the filing of the petition for dissolution. *Fuehrer*, 651 N.E.2d at 1174. As we have stated above, trial courts have broad discretion when valuing marital property. *See Houchens*, 758 N.E.2d at 590. Pursuant to this discretion, trial

courts may choose the date of valuation anytime between the date upon which the petition for dissolution was filed, and the date of the dissolution hearing. *Bertholet v. Bertholet,* 725 N.E.2d 487, 497 (Ind.Ct. App.2000). Susan provided to the trial court the evidence of the value of the Midland Annuity at the time she filed her petition for dissolution, and the trial court relied upon this evidence in making the property distribution, and we conclude that the trial court did not abuse its discretion by doing so.

### CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion or commit clear error when valuing and distributing the marital property of the parties, except that the trial court's Order failed to account for approximately $31,000 worth of personal property. We remand for the trial court to distribute this property and adjust its split of the marital property accordingly.

Affirmed in part, and remanded for further proceedings.

MATHIAS, J., and BRADFORD, J., concur.