## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 29 2019, 9:27 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Darlene R. Seymour
William P. Means
Roberts Means, LLC
Carmel, Indiana

ATTORNEY FOR APPELLEE

Bryan H. Babb
Bose McKinney & Evans LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Bryan Wesolek, <br> *Appellant-Respondent,* <br><br> v. <br><br> Dana Wesolek, <br> *Appellee-Petitioner* | August 29, 2019 <br><br> Court of Appeals Case No. 18A-DR-2419 <br><br> Appeal from the Porter Superior Court <br><br> The Honorable Douglas McMillan, Judge Pro Tem <br><br> Trial Court Cause No. 64D02-1404-DR-3264 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Bryan Wesolek ("Husband") appeals the trial court's decree dissolving his marriage to Dana Wesolek ("Wife"). Husband argues that the trial court erred by including certain property in the marital pot, in its valuation of Husband's business, and by finding Husband in contempt. We affirm.

# Facts and Procedural History

[2] Although the dissolution decree covers many topics, this appeal concerns only a few of them. Accordingly, we set forth the facts that are relevant to the issues the parties raise on appeal.

[3] In 1991, Husband founded Data Limited, Inc. (DLI), which designed and manufactured rugged computer equipment, such as industrial tablets used by Disney and Anheuser-Busch. In 1997, Husband and Wife were married. No children were born to the marriage. During the marriage, Husband owned and operated DLI. In 2000, Husband and Wife created Wesolek Properties, LLC, which built or purchased various properties to house DLI's operations. Husband and Wife shared 50-50 ownership in Wesolek Properties. In 2010, Husband expanded DLI's business and opened a location in Taiwan. Upon entry into the Taiwanese market, Husband purchased personal stock in Arbor, a company that DLI had a business relationship with. In early 2013, Wesolek Properties purchased commercial real estate located on Lee Street ("Lee Street property") in Lehigh Acres, Florida, and Husband moved DLI's operations to

that location. In late 2013, DLI's business began declining. By the beginning of 2014, DLI's sales had not improved, and its inventory was increasing.

[4] Wife filed a petition for dissolution of marriage on March 10, 2014. While the dissolution was pending, DLI's problems began to spiral out of control. In 2016, many of DLI's devices were rendered unusable because of an issue with the wireless-network card purchased from Intel. When Husband couldn't fix the defective Intel cards himself, he was forced to replace the cards, costing DLI $450,000. By July 2017, DLI's relationships with its customers had become so damaged that Husband sold DLI to Comark, another company in the rugged computer-equipment industry, for $1,200,000.

[5] In December 2017, the trial court held the final dissolution hearing over three days. The most contentious issue was the value of DLI. Wife presented the testimony of Chris Hirschfeld, an accredited senior appraiser, regarding its value. Hirschfeld testified that using the asset-based approach, the value of DLI as of March 10, 2014—the date of filing—was $2,940,000. *See* Tr. Vol. II p. 128.

[6] To refute Wife's expert's valuation of DLI, Husband called Robert Schlegel, a certified business appraiser, to testify regarding the value of DLI. Schlegel stated that he had completed two valuations of DLI. His first valuation valued DLI as of the date of filing. Using the asset-based approach, Schlegel found that the value of DLI's assets was $418,000. *See* Tr. Vol. IV p. 58; *see also* Resp't's Ex. 5. On cross-examination, Wife's attorney asked Schlegel whether

he considered the finding of Accell, another accounting firm, that there should have been an $824,284 increase in DLI's 2014 equity. *See id.* at 60; *see also* Pet'r's Ex. 32. Schlegel stated that he did not consider Accell's finding and could not say whether a $824,284 increase in equity would increase the value of DLI under the asset-based approach. *See* Tr. Vol. IV pp. 60, 62-63. Schlegel then testified about his second valuation of DLI following its sale to Comark. Using the asset-based approach, Schlegel found that the value of DLI's assets was zero. *See id.* at 48; *see also* Resp't's Ex. 6. Schlegel explained that although DLI had been sold to Comark for $1,200,000, DLI had outstanding debts over $4,000,000 and that because a valuation can't be less than zero, the reportable value is zero. *See* Tr. Vol. IV pp. 48-49.

[7]   Another issue of contention was whether Husband sold his shares of Arbor stock before Wife filed her petition for dissolution. Wife testified that Husband provided three overseas bank-account documents, written in Taiwanese, as "backup" for the Arbor stock sale. Tr. Vol. III p. 209. Wife stated that she could not "make heads or tails of" the documents and did not know when Husband sold his stock in Arbor. *Id.* at 210-11. On cross-examination, Husband's attorney asked Wife about an Excel spreadsheet that Husband had created allegedly showing that his Arbor stock had been sold in 2013 for $110,934.76. Wife acknowledged that she had received the Excel spreadsheet but said that it did not show the alleged stock sale. *See* Tr. Vol. IV p. 78. Wife said that she thought "there would be stock transfer information" but that she never received any of that information. *Id.*

[8]     In April 2018, the trial court issued a decree of dissolution. As for the value of

DLI, the trial court explained:

> Considering the asset based approach as the most equitable value
> determination for a manufacturing operation, and fully
> considering the other factors . . . , the Court strongly considered
> the averaging of Hirschfeld's (Wife's Valuator) original asset
> based valuation in the amount of $2,414,000 and Schlegel's
> (Husband's Valuator) asset based valuation in the amount of
> $1,243,000 [$419,000 + $824,000] (adjustment for prior years[']
> understated equity) for a **total value of $1,828,500**. However,
> this does not in the Court's opinion fully take into consideration
> the full difficulties and impact of the business influences of the
> faulty Intel Wireless product. Also, using [Husband's] own
> Appraiser (which it might be assumed as illustrated this was
> significantly lower than that of [Wife's]). The Court finds the
> equity adjustment appropriate due to the additional investigation
> completed [by Accell]. The Court therefore determines that the
> most equitable valuation for [DLI] prior to the onset of the
> outside influences of Intel [in 2016,] to be the asset based
> approach of [Husband's] appraiser, (with adjustment for the
> understated equity) to be **$1,243,000**.

Appellant's App. Vol. II pp. 74-75, 83 (emphases in original). Regarding the

Arbor stock, the trial court found:

> To Wife's knowledge and as she testified, the stock was in
> existence at the time she filed her Petition. . . . Through
> discovery, the only evidence provided by Husband to document
> this stock and/or its sale was an Excel spreadsheet with excerpts
> from overseas bank accounts seemingly unrelated to this
> transaction as the dates do not coincide with Husband's alleged
> stock sale time frame of May 9, 2013 through May 15, 2013[.]

*****

> The Court finds that Husband has provided insufficient evidence to support the date of sale for the Arbor stock personally held. This bank account information is insufficient as it fails to adequately trace the sale of the Arbor stock. The Arbor stock net sale proceeds totaling $110,934.76 constitute a portion of the marital estate and this amount is set over to Husband.

*Id.* at 84; *see also* Pet'r's Ex. 35. Finally, the trial court assigned the Lee Street property "in full portion to the Husband in the appraised value of 2,000,000 dollars, less the indebtedness on the property of $452,982 for an asset valuation to the Husband of 1,547,018.00." Appellant's App. Vol. II p. 28. The trial court ordered that "documentation, quit claims, etc. will be made removing Wife from her position of [50%] ownership of Wesolek Properties and only upon full and complete settlement of all terms of this decree." *Id.* After the trial court assigned the parties their respective properties, it divided the marital pot 50-50 and ordered Husband to pay Wife a lump-sum equalization payment in the amount of $1,276,275.13 within 180 days. *See id.* at 93.

[9] On May 23, Husband filed a motion to correct error. The next day, May 24, Wife filed her own motion to correct error. On May 25, the trial court scheduled Husband's motion for a hearing on August 14. *See id.* at 140. Two weeks later, Husband filed a response to Wife's motion to correct error, requesting "that all matters raised in Wife's Motion be set to be heard concurrently with Husband's Motion to Correct Error on August 14, 2018." Appellee's App. Vol. II pp. 13-14. At some point after Husband filed his

response to Wife's motion to correct error, but before the August 14 hearing, he sold the Lee Street property.

[10] On August 14, the trial court held a hearing on the parties' motions to correct error. During the hearing Wife's attorney told the trial court that "on July 26th of this year, [Husband], on behalf of Wesolek Properties, sold [the] Lee Street [property]." Aug. 14, 2018 Tr. p. 24. Wife alleged that Husband had not paid her the equalization payment and that she was still a 50% owner of Wesolek Properties LLC, which, in turn, had previously owned the Lee Street property. Following the hearing, the trial court issued an order, which denied Husband's motion to correct error and granted Wife's motion to correct error in part.[1] The trial court's order also dealt with the Lee Street property, finding that Husband sold the Lee Street property before he had made any equalization payments to Wife as he was required to do and before removing Wife "as 50% owner of Wesolek Properties." Appellant's App. Vol. II p. 101. The trial court therefore ordered Husband to immediately "deposit the proceeds from [the sale of the Lee Street property] to be held by the Clerk of Porter County." *Id.* at 97-98.

---

[1] Husband asserts that the trial court did not set Wife's motion to correct error for a hearing within 45 days of Wife filing it, that the motion was therefore deemed denied pursuant to Trial Rule 53.3(A), and that because the motion was deemed denied the trial court had no authority to grant any part of it. This argument is patently disingenuous. In his June 7, 2018 response to Wife's motion—filed two weeks after Wife filed her motion—Husband specifically requested "that all matters raised in Wife's Motion . . . be set to be heard concurrently with Husband's Motion to Correct Error on August 14, 2018." Appellee's App. Vol. II p. 14. Tellingly, Husband fails to acknowledge that request in his briefs on appeal, and he left the response out of his appendix.

[11]     On September 10, after confirming with the Clerk of Porter County that Husband had not made any deposit as he was ordered to, the trial court set an emergency show-cause hearing for September 13 regarding Husband's sale of the Lee Street property. Husband appeared telephonically and, after being sworn in, was asked various questions about the sale of the Lee Street property by Wife's attorney. When asked what he sold the Lee Street property for, Husband refused to answer the question. *See* Sept. 13, 2018 Tr. p. 9. Husband also refused to answer a question regarding whether a check was issued at closing. After some discussion, the following colloquy ensued:

> The Court:   How much was the property sold for?
>
> [Husband]:   Respectfully, Your Honor, I'm not going to answer that question.
>
> *****
>
> The Court:   Was there a check issued at the time of closing?
>
> [Husband]:   Respectfully, I'm not going to answer that question.
>
> *****
>
> The Court:   Okay. Well, here's what we're going to do, [Husband]. We are resetting this for a new court day. That will be September 26[.]
>
> I am finding you in direct contempt of this court for your refusal to answer those two questions in

particular, and your overall reticence in answering this court truthfully. You are ordered to appear here personally on that date, September 26 . . . to answer those contempt citations.

*Id.* at 18-20. At the hearing on September 26, an attorney appeared on Husband's behalf, but Husband himself did not appear and no explanation was given for his absence. Thereafter, the trial court took Wife's request for a body attachment and additional sanctions under advisement. To date, the trial court has not decided whether to issue a body attachment or additional sanctions. *See* Cause No. 64D02-1404-DR-3264.

[12] Husband now appeals.

# Discussion and Decision

[13] Where, as here, the trial court enters special findings and conclusions pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review. *Barton v. Barton*, 47 N.E.3d 368, 373 (Ind. Ct. App. 2015), *trans. denied*. We determine first if the evidence supports the findings and second whether the findings support the judgment. *Id.* The trial court's findings and conclusions will be set aside only if clearly erroneous. *Id.* We neither reweigh the evidence nor reassess witness credibility. *Id.* Instead, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them. *Id.*

# I. Property in the Marital Pot

Husband first contends that the trial court erred when it included the Arbor stock in the marital pot. He alleges that the Arbor stock was sold before the filing of the dissolution petition, and therefore it cannot be included in the marital pot. It is well settled that in a dissolution action, all marital property, whether owned by either spouse before the marriage, acquired by either spouse after the marriage and before final separation of the parties, or acquired by their joint efforts, goes into the marital pot for division. Ind. Code § 31-15-7-4(a); *Falatovics v. Falatovics*, 15 N.E.3d 108, 110 (Ind. Ct. App. 2014). The date of "final separation" is the date the petition for dissolution is filed. Ind. Code § 31-9-2-46. "The requirement that all marital assets be placed in the marital pot is meant to insure that the trial court first determines that value before endeavoring to divide property." *Montgomery v. Faust*, 910 N.E.2d 234, 238 (Ind. Ct. App. 2009). "Indiana's 'one pot' theory prohibits the exclusion of any asset in which a party has a vested interest from the scope of the trial court's power to divide and award." *Falatovics*, 15 N.E.3d at 110 (quotation omitted). While the trial court may decide to award a particular asset solely to one spouse as part of its just and reasonable property division, it must first include the asset in its consideration of the marital estate to be divided. *Id.*

With respect to the Arbor stock, Husband asserts that the evidence shows that he sold the stock before Wife filed the dissolution petition and that Wife conceded that Husband sold the stock in 2013. Neither assertion is correct. First, the trial court found that the evidence Husband alleges shows that the

Arbor stock was sold before March 10, 2014, is documentation from three overseas bank accounts, written in Taiwanese, that was unrelated to the sale of the Arbor stock. *See* Pet'r's Ex. 35. Next, Wife testified that she "could not make heads or tails" of the three bank-account documents, written in Taiwanese, and that she believed the Arbor stock was in existence when she filed her dissolution petition. Tr. Vol. III p. 210. Therefore, Husband's argument amounts to a request for us to reweigh the evidence, which we do not do. *See Barton*, 47 N.E.3d 373. Accordingly, we find that the trial court did not abuse its discretion by including the Arbor stock in the marital pot.

## II. Valuation of DLI

[16] Next, Husband challenges the trial court's valuation of DLI. Specifically, Husband argues that there "is no date assigned" and "no methodology to explain how the trial court arrived at" a value of $1,243,000.00 for DLI. Appellant's Br. p. 24.

[17] A trial court has broad discretion in determining the date upon which to value marital assets. *McGrath v. McGrath*, 948 N.E.2d 1185, 1187 (Ind. Ct. App. 2011). We have said that the trial court may select any date between the date of filing of the petition for dissolution and the date of the final hearing. *Id.* A trial court's decision in ascertaining the value of property in a dissolution action is reviewed for an abuse of discretion. *Del Priore v. Del Priore*, 65 N.E.3d 1065, 1076 (Ind. Ct. App. 2016), *trans. denied*. Generally, there is no abuse of discretion if a trial court's chosen valuation is within the range of values

supported by the evidence. *Id.* "A valuation submitted by one of the parties is competent evidence of the value of property in a dissolution action and may alone support the trial court's determination in that regard." *Id.* (citing *Alexander v. Alexander*, 927 N.E.2d 926, 935 (Ind. Ct. App. 2010), *trans. denied*). On appeal, "we resist the temptation to get deeply involved in analyzing the valuation evidence presented at trial." *Quillen v. Quillen*, 671 N.E.2d 98, 100 (Ind. Ct. App. 1996). Finally, when we review a trial court's valuation of property in a dissolution, we will neither reweigh the evidence nor judge the credibility of witnesses. *Del Priore*, 65 N.E.3d at 1076-77.

[18] The record reveals that the trial court heard evidence regarding the value of DLI as of March 2014—the date of filing—and as of July 2017—the date of sale to Comark. Wife's expert, Hirschfeld, valued DLI at $2,940,000.00 as of March 2014. *See* Pet'r's Ex. 5. Husband's expert, Schlegel, completed two valuations of DLI—one valuing DLI as of the date of filing and the other valuing DLI as of the date of sale to Comark. Schlegel's first valuation found that the value of DLI as of the date of filing was $418,000. *See* Tr. Vol. IV p. 58. Wife challenged Schlegel's valuation of DLI by presenting evidence that Accell, another accounting firm, had found that DLI had $824,284 in understated equity, which would increase the value of DLI as of the date of filing. *See id.* at 60. Regarding his second valuation, Schlegel testified that DLI had zero value after its sale to Comark in July 2017. *See* Tr. Vol. IV pp. 48-49. Schlegel said that his zero-value appraisal accounted for the rapid decline and

collapse of DLI. *See id.* at 47-49. After the final hearing, the trial court's order explained its determination of the value of DLI:

> The Court therefore determines that the most equitable valuation for [DLI] prior to the onset of the outside influences of Intel [in 2016] to be the asset based approach of [Husband's] appraiser [$418,000] (with adjustment for the understated equity [$824,000]) to be **$1,243,000.**

Appellant's App. Vol. II p. 83 (emphases in original).

[19] First, we note that the trial court's valuation of DLI was within the range of values supported by the evidence. *See Del Priore*, 65 N.E.3d at 1076. Next, we disagree with Husband's assertion that the trial court did not assign a specific date to its valuation. That is, the trial court used Schlegel's valuation of DLI as of March 10, 2014—the date of filing—and added $824,000 of understated equity, discovered by Accell, to determine a value for DLI. As such, because the trial court's valuation of DLI is within the range of values supported by the evidence, we cannot say that the trial court abused its discretion in valuing DLI.

# III. Contempt

[20] Finally, Husband argues that "the trial court's finding that [Husband] is in contempt for his sale of the Lee Street property is erroneous as a matter of law." Appellant's Br. p. 35. Contempt of court generally involves disobedience of a court or court order that undermines the court's authority, justice, and dignity. *Reynolds v. Reynolds*, 64 N.E.3d 829, 832 (Ind. 2016). There are two kinds of contempt: direct contempt and indirect contempt. *Id.* Direct contempt, which

is at issue in this case, involves "acts which are committed in the presence of the court or in such close proximity to it so as to disrupt its proceedings while in session." *In re A.S.*, 9 N.E.3d 129, 132 (Ind. 2014) (quoting *State v. Heltzel*, 552 N.E.2d 31, 34 (Ind. 1990)). The General Assembly has codified the elements and procedural requirements for direct contempt. *See* Ind. Code chapter 34-47-2. Here, Husband asserts that insofar as the contempt finding is related to the sale of the Lee Street property, it constitutes an impermissible modification of the Final Decree. *See* Appellant's Br. p. 35.

[21] First and foremost, Husband confuses which act forms the basis of the trial court's contempt finding. That is, Husband argues that the trial court found him in contempt for selling the Lee Street property; however, the trial court explicitly stated that it was finding him "in direct contempt" for refusing to answer two questions regarding the sale of the Lee Street property. Sept. 13, 2018 Tr. p. 20. The procedural requirements for finding direct contempt are codified in Indiana Code section 34-47-2-2, which in relevant part provides:

> Every person who:
>
>> (1) is sworn to testify as a witness, in any trial or proceeding, in any court of record, and refuses to testify in the trial or proceeding;
>>
>> (2) is required by any court to be sworn in any trial or proceeding, and refuses to take an oath or affirmation; or

(3) while upon the witness stand, is purposely so demeaning as to retard or disturb the proceedings of the court;

is considered guilty of a direct contempt of court.

In his opening brief, Husband does not acknowledge that after he was called as a witness and sworn in, he refused to answer questions about the sale of the Lee Street property, even after he was given multiple opportunities. *See* Sept. 13, 2018 Tr. pp. 19-20. After Wife points this out, Husband still does not acknowledge his refusal to answer two questions regarding the sale of the Lee Street property in his reply brief. As such, we find that the trial court did not err by finding Husband in direct contempt for refusing to answer the trial court's questions.

[22] Affirmed.

Kirsch, J., and Altice, J., concur.