# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 18 2019, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

**APPELLANT PRO SE**

Roger A. Carter
Niles, Michigan

**ATTORNEY FOR APPELLEE**

Stephen P. Rothberg
Fort Wayne, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Roger A. Carter, <br> *Appellant-Petitioner,* <br><br> v. <br><br> Jennifer Carter, <br> *Appellee-Respondent* | March 18, 2019 <br><br> Court of Appeals Case No. 18A-DR-377 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Charles F. Pratt, Judge <br><br> The Honorable Sherry A. Hartzler, Magistrate <br><br> Trial Court Cause No. 02D07-1503-DR-292 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Roger A. Carter ("Husband"), pro se, appeals the trial court's decree dissolving his marriage to Jennifer Carter ("Wife") and the trial court's subsequent order denying his motion to correct error. Husband argues that the trial court erred in determining what property to include in the marital pot; valuing several marital assets; ordering him to pay the majority of Wife's attorney's fees; and declining to reduce the equalization payment due to Wife by the amount that Husband paid to Wife in provisional payments while the dissolution was pending. Finding no error, we affirm.

# Facts and Procedural History

[2] Husband and Wife were married in December 2005. This was both Husband's and Wife's second marriage. No children were born to the marriage, but at some point, Husband was appointed as co-guardian of Wife's incapacitated adult daughter, J.K. Husband and Wife worked consistently during their marriage. Husband is the majority owner of a computer-consulting business, DBConnect, Inc., which he founded before the marriage.[1] Wife is a physical-therapy assistant. Husband and Wife purchased the marital residence ("Greythorne") during their marriage.

---

[1] Throughout the record, because Husband is the President and primary employee of DBConnect, he and DBConnect are referred to interchangeably. To avoid confusion, we have distinguished between DBConnect and Husband where appropriate.

[3]     Husband filed a petition for dissolution of marriage on March 5, 2015. On March 30, Husband filed a separate action to remove Wife as co-guardian of J.K. By mediated agreement, Wife became J.K.'s sole guardian on August 10, 2016, and Husband and Wife agreed to pay their own attorney's fees related to the guardianship case.

[4]     In June 2015, the trial court entered a provisional order requiring Husband to pay temporary spousal maintenance to Wife. *See* Appellant's App. Vol. II p. 56 (stating that Husband was to pay Wife a lump sum of $1500 for the first four weeks and then $700 a week until October 1, 2015). Husband was also ordered to pay $4500 in preliminary attorney's fees to Wife's counsel. In January 2016, the trial court modified its provisional order but still required Husband to pay $700 a week in temporary spousal maintenance to Wife.

[5]     In December 2016, the trial court held the final dissolution hearing over two days. Although Husband had earlier been represented by counsel, he appeared pro se at the hearing. The major areas of contention were: (1) the value of Husband's business, (2) the value of the marital residence, and (3) Wife's request for attorney's fees. Regarding the value of his business, DBConnect, Husband submitted two alternative business valuations that he created, showing that on the date the petition for dissolution was filed, the value of DBConnect was either negative $59,262.51 or negative $85,586.82. Exs. 21-22; *see also* Tr.

Vol. I p. 51.[2]  Husband said that he calculated these valuations by offsetting the value of DBConnect on March 5, 2015, with the value of DBConnect before the marriage in 2005.  Tr. Vol. I p. 58.  Husband's valuations also excluded part of a $150,000 customer payment that DBConnect received in December 2014, about four months before he filed for divorce.  Husband explained that he excluded part of this payment because the customer wanted to prepay for 600 hours of work for which he would bill $250 an hour.  *See* Ex. 30.  Husband testified that by the date the petition for dissolution was filed, he had worked 245.5 hours (i.e., completed $61,375 worth of work) and contended that there was "something along the lines of $88,000 of unearned income" remaining, which would require Husband to work an additional 354.5 hours.  Tr. Vol. I p. 59.  Husband stated that he therefore excluded approximately $88,000 from his two valuations of DBConnect.

[6] Wife disputed Husband's exclusion of $88,000 of the $150,000 payment in his two valuations of DBConnect.  On cross-examination, Wife's attorney questioned Husband regarding DBConnect's treatment of the $150,000 payment.  In response, Husband testified that once DBConnect received the $150,000 payment, it was deposited into DBConnect's bank account.  *Id.* at 122; *see also* Ex. Y (showing a $150,000 deposit made into DBConnect's bank account on December 18, 2014).  Husband also acknowledged that the

---

[2] While the record encompasses multiple hearings (each with its own transcript and exhibits), all transcripts and exhibits cited in this opinion are from the final dissolution hearing, which occurred December 5-6, 2016.

$150,000 payment was reported as income on DBConnect's 2014 tax return. Tr. Vol. I p. 124; *see also* Ex. W. Wife's attorney then questioned Husband regarding DBConnect's purchase of a large quantity of shares in Cyclone Power Technologies, Inc. for DBConnect's employees' Simplified Employee Pension Individual Retirement Accounts (SEP-IRAs) after receiving the $150,000 payment. Tr. Vol. I pp. 124, 136-37, 143; *see also* Ex. HH (showing a $52,000 check was deposited into Husband's SEP-IRA on December 22, 2014). Husband admitted that after DBConnect received the $150,000 payment it wrote two checks (one for $41,250 and the second for $52,000) to fund its two employees' SEP-IRAs, but he contended that DBConnect would have had enough money to fund its employees' SEP-IRAs without the $150,000 payment. Tr. Vol. I p. 152.

[7] To refute Husband's two valuations of DBConnect, Wife called James Houlihan, a certified valuation analyst, to testify regarding the value of DBConnect. Houlihan stated that he had reviewed DBConnect's financial statements, including bank statements, income statements, and tax returns, and interviewed Husband to determine a value for DBConnect. *Id*. at 222. Houlihan found that DBConnect was "a very valuable business" and was "profitable" on the date Husband filed his petition for dissolution. *Id*. at 223. However, much of DBConnect's value was attributable to Husband's goodwill, which Houlihan did not include in his valuation of the business. Explaining that he took a "fairly conservative approach," Houlihan estimated that DBConnect's value as of March 5, 2015, was $209,000. *Id*. at 226. Houlihan

said that he included the $150,000 payment that DBConnect received in December 2014 in his valuation because it was "recognized as income" on DBConnect's 2014 tax return, the agreement (drafted by DBConnect with the customer) did not state that any money "would be repaid through lack of performance," and a "large amount of profit sharing was paid out" shortly after DBConnect received the $150,000 payment. *Id.* at 227-28; *see also* Exs. 24, E, W, Y.

[8] On cross-examination, Husband questioned Houlihan's valuation of DBConnect. First, Husband asked Houlihan how he came up with $209,000 as the value of DBConnect. Houlihan responded that he reviewed DBConnect's balance sheets which included "cash from both cash accounts," a "revolving line of credit," a "short-term investment account," "payroll tax liabilities," and "bills." Tr. Vol. I p. 235. Houlihan stated that he also reviewed DBConnect's income statements, which included its "accounts receivable." *Id.* at 236. Focusing on DBConnect's short-term investment account, Husband told Houlihan that the investment account, which was funded almost entirely with Cyclone stock, had a market value of "maybe two dollars," and therefore questioned why Houlihan had valued the account at $29,995. *Id.* Houlihan replied that he had done so because that was the value that DBConnect gave this investment account on its tax returns and balance sheets. *Id.*; *see also* Ex. 24 (showing $29,994.97 in "other assets" on DBConnect's balance sheet as of March 5, 2015); Ex. D (showing $29,994.97 in "other assets" on DBConnect's balance sheet as of March 28, 2015); Ex. X (listing a $29,995 short-term

investment asset on DBConnect's 2015 tax return); Ex. W (listing a $29,995 short-term investment asset on DBConnect's 2014 tax return). Husband then asked Houlihan to hypothetically value DBConnect and assume that the short-term investment account was worthless:

> Q    [F]or the sake of argument if I tell you that $30,000 short-term investment that you included is worthless would you not just subtract $30,000 off the $209[,000] and come up with $179[,000]?
>
> A    Yes . . . my objective was to determine what the fair market value of the assets were.

Tr. Vol. I p. 248.

[9]    Next, Husband questioned why Houlihan included the entire $150,000 payment in his valuation of DBConnect. In response, Houlihan explained that he did not agree with Husband's contention that as of March 5, 2015, approximately $88,000 out of the $150,000 payment was "unearned income," stating:

> I was asked to say what's this business worth at a point in time . . . at that point I am addressing not necessarily the earned or unearned nature of that money but the restrict[ed] or unrestricted nature of that money if [DBConnect] . . . would've closed the books on that day . . . I don't know what the recourse would've been[,] [the customer] w[as] not a secured creditor as to the money at least I couldn't tell by any of the documents so you may have had to perform services after that date but that would not have affected the amount of money that [DBConnect] would've put in [its] pocket on that date of valuation if

[DBConnect] had been liquidated and that was how I made my determination. [A]s of that date that money was unrestricted and available to be distributed . . . the money coming in December, a part of it . . . was paid out into a profit sharing which is a trust that [DBConnect] could not get the money out of. [A]ll I'm doing is recognizing when did [DBConnect] receive that money and the bases of the value liquidating um approach that I valued [DBConnect].

*Id*. at 242-45. Husband then asked if Houlihan knew whether the profit sharing would have been paid out with or without the $150,000 payment. Houlihan responded that before the $150,000 payment was deposited, DBConnect's bank account balance was insufficient to pay out the amount of profit sharing that was ultimately paid out. Tr. Vol. II p. 4; *see also* Ex. Y (showing DBConnect's account balance on December 15, 2014, was $74,206.35; then after the $150,000 payment was received on December 18, 2014, DBConnect's account balance was $224,191.35; and on December 23, 2014, DBConnect wrote two checks totaling $93,250).

[10] Wife also called Matthew James, a financial adviser, to testify regarding the value of DBConnect's employees' SEP-IRAs and its short-term investment account. Both DBConnect's employees' SEP-IRAs and its short-term investment account were funded almost entirely with Cyclone stock. *See* Tr. Vol. I pp. 124, 136-37, 143. James testified that Cyclone is "an over-the-counter stock," i.e., "pink sheet" or "penny stock," that is "not available on a listed exchange such as the New York Stock Exchange" and is "traded between parties" rather than on an exchange. Tr. Vol. II pp. 50, 52. James further

stated that Cyclone is "a very low-priced" stock, and that he "would not advise" his clients to purchase stock in Cyclone. *Id*. Regarding the value of an over-the-counter stock, such as Cyclone, James explained that in over-the-counter stock sales "the value [that] was paid or [what it was] sold for again" is not reported in "the same way a[n] exchange listed stock has to be reported," and that a "number value quoted" for Cyclone stock "does not necessarily bear any relationship" to what those investments could bring if sold. *Id*. at 53.

[11] Another issue was the value of the marital residence, Greythorne. After the petition for dissolution was filed, Husband refinanced Greythorne in July 2015 with Nationstar Mortgage. *See* Ex. QQ. When Husband applied for refinancing, the appraised value of Greythorne was $471,000. *See* Ex. RR. To secure refinancing, Husband testified that he was required to pay more than the required closing costs, and that in August 2015, he received a refund of approximately $2800 from Nationstar. Tr. Vol. II pp. 94-95; *see also* Ex. GG (showing a $2434.82 wire transfer from Husband to Nationstar on July 28, 2015; a $2817.95 check written from Nationstar to Husband dated August 20, 2015; and a $2817.95 deposit made into Husband's ProFed checking account on August 31, 2015). In May 2016, Husband sold Greythorne for $465,000. *See* Ex. TT. As part of the purchase, the buyer submitted $4000 in earnest money to "be applied to the purchase price at closing." *Id*. After paying off the balance of the mortgage and costs of the sale, Husband received $38,048 in net proceeds from the sale of Greythorne. *See* Tr. Vol. I p. 69. Wife disputed Husband's valuation of Greythorne and called Jeffrey Haller, a certified

residential appraiser, to testify regarding the value of Greythorne. Haller testified that he believed that the fair market value of Greythorne was $478,000 and would not have recommended to "sell for any less than this." Tr. Vol. II p.45.

[12] Finally, Husband challenged Wife's request for attorney's fees. Wife's attorney stated that he had represented her in both the divorce and guardianship case. Wife's attorney testified that in the divorce case he "charged [Wife] at the rate of $285 an hour" and stated that the costs of his legal services, including post-trial work, were $97,930.75 and litigation expenses were $8327.10. Tr. Vol. II p. 96. Wife's attorney testified that in the guardianship case, he had billed $29,768.25 for legal services and $205 for litigation expenses. Tr. Vol. II p. 97. Wife's attorney also provided the timekeeping and billing statements for both cases. *See* Exs. HHH, III. Wife's attorney stated that the timekeeping and billing statements did not include the amounts he had been paid but testified that he had been paid "just under $33,500" for representing Wife in both matters and had allocated the "greater portion of that to the guardianship case." Tr. Vol. II p. 99. Husband also testified and stated that while he was represented by counsel, he was billed $54,533.79 in the dissolution action and $103,471.61 in the guardianship case. *Id*. at 107; *see also* Ex. 77. At the conclusion of the hearing, the trial court took the matter under advisement, and both parties submitted proposed findings of fact and conclusions.

[13] On April 11, 2017, the trial court issued a decree of dissolution. The decree addressed Greythorne as follows:

14.  The Court finds through the testimony of the qualified real estate appraiser that [Greythorne] had a fair market value of $478,000[.]

\*\*\*\*\*

23.  The Court finds that [Greythorne] ultimately sold for $465,000.00 on May 11, 2016 resulting in net proceeds in the amount of $38,048.

\*\*\*\*\*

25.  Husband contends that the value of [Greythorne] relative to the marital estate should be the net proceeds from the sale in the amount of $38,048.00. [i.e., $465,000 (sale price) - $33,422 (earnest money + costs of the sale) - $393,530 (mortgage payoff) = $38,048]

26.  Wife contends that the value of the marital residence should be the fair market value of the residence less the mortgage encumbering the property at the time of sale. [i.e., $478,000 (fair market value) - $393,530 (mortgage payoff) = $84,470.07 (Wife did not include the costs of the sale)]

\*\*\*\*\*

31.  The Court finds that [Greythorne] was unilaterally sold by Husband for $465,000.  The Court finds that the costs for the sale and marketing of the home amounted to $29,422.45.  The Court finds that the payoff for the mortgage was $393,529.93.

32.  The Court finds that [the] effective value of [Greythorne] for purposes of the marital estate is $55,047.62.  This sum is arrived

at by the fair market value of $478,000 less the costs of the sale and the payoff of the mortgage.

Appellant's App. Vol. II p. 192. As for the value of DBConnect, the court explained:

33. Ninety percent (90%) of [DBConnect's] outstanding stock is owned by [Husband], and the remaining 10% by its only other employee. While not entirely clear from the evidence, [Husband] appears to have sponsored alternate values, most significantly including a negative value for DBConnect.

34. James Houlihan, a qualified expert, conducted a business valuation of DBConnect and testified at trial. Houlihan's evidence was to the effect that while the business was worth substantially greater than its net asset value, that additional value was bound up in "personal goodwill" and Houlihan therefore concluded the value of [DBConnect] at separation was $209,000.00, or, the "net asset value" of the business . . . Ninety percent (90%) of Houlihan's conclusion of value is $188,100.00.

35. Significant dispute over the DBConnect valuation relates to the treatment of DBConnect revenues paid in late December of 2014, a short time prior to legal separation, in the amount of $150,000.00, which Houlihan included in his valuation of DBConnect. [Husband] disputed this inclusion, stating that it should not be treated as a component of value for DBConnect, as it was "pre-payment" for a client, for work not performed at legal separation, and, as such, not includable as a business asset.

36. However, and as was described by Houlihan, [DBConnect] treated this payment as if it was in fact an asset of the business, noting, among other facts:

a. There was no provision in the operating agreement/contract (Prepared by [DBConnect]) between DBConnect and the customer for repayment of the monies ([Ex. 33]).

b. The payment was treated on the books and records of DBConnect as "income" when it [was] received in 2014 ([Exs. L, Y]), and was also reflected in tax returns of DBConnect ([Ex. W]) and the 2014 joint tax return of the parties ([Ex. BB]).

c. That immediately upon [r]eceipt, [DBConnect] promptly disposed of a significant amount of said funds towards the purchase of an asset, which, in the normal course, is or was not one to which [DBConnect] would have access, that being, the purchase of securities to fund [Husband's] SEP IRA ([Exs. HH, II]).

\*\*\*\*\*

38. The above-noted facts . . . lead[] the Court to fix a value of DBConnect to the marital estate at $188,100.00.

*Id*. at 193-94. Regarding Wife's request for attorney's fees, the court found:

48. Contemporaneous with bringing the dissolution action, [Husband] filed suit in the Probate Division of this Court to remove [Wife] as the Guardian of the person and estate of her profoundly disabled, biological daughter, [J.K.]. In addition to the Complaint/Petition, the Court notes the final Order in that matter in evidence, wherein [Wife] remains as the child's Guardian, but not, given other evidence, at no cost. That is, among her financial circumstances at the time the Decree is to be entered is a debt of over $30,000.00 in attorney fees and related expenses occasioned by dealing with [Husband's] lawsuit.

*****

53. The Court concludes that the economic circumstances of Wife are dire in comparison to the economic circumstances of Husband at the time of disposition.

*****

71. The Court addresses the issue of attorney fees and litigation expenses. In doing so, it incorporates certain other of these Findings related to income disparity, the ability to pay counsel, . . . financial circumstances at the time distribution is to become effective. In addition, the record in this case is replete with evidence that significant in those efforts required of [Wife] and her counsel were occasioned and may necessary for litigation decisions of [Husband], or those on his behalf. By way of example only, the Court notes its Order of August 26, 2016[,] following a hearing on discovery issues requiring almost one-half day of Court time, exclusive of time expended in Court filings, wherein [Husband] adopted litigation posture in this case unjustified by the Rules of Discovery, and cause what should have been a self-executing process significant time and expense for all concerned[.]

72. The Court has considered the effect of its Provisional Orders as a function of this issue and has adjusted the attorney fee Order accordingly, but does not find that additional credits (to [Husband]) are due.

73. Husband shall be ordered to pay toward Wife's attorney fees and litigation expenses the sum of $84,500.00.

*Id.* at 197, 199, 202-03. Finally, the trial court ordered Husband to pay Wife an equalization judgment in the amount of $55,321.31, which accrues judgment interest until paid in full. *Id.* at 202 (Finding 69).

[14] In May 2017, Husband filed a motion to correct error contending that the trial court "made factual errors, did not properly consider certain evidence, and . . . misapplied the law," and requested that the trial court "reweigh the evidence accordingly." *Id.* at 144. Husband also argued that the trial court's valuation of DBConnect was incorrect because it "failed to account for accrued payroll" and "accrued vacation/leave time" that would be immediately payable if the business was liquidated. *Id.* at 152. Husband asserted that Wife's expert, Houlihan, relied on balance sheets to value DBConnect, but because payroll accruals are not carried on balance sheets, Houlihan's valuation of DBConnect was incorrect. *Id.* In support, Husband attached an affidavit to his motion, which he prepared and signed stating that as of March 28, 2015, DBConnect "had an accrued payroll totaling $17,600.41" and "accrued vacation pay totaling $17,600.41." *Id.* at 169. In January 2018, the trial court held a hearing on Husband's motion to correct error and thereafter denied it in all respects.

[15] Husband now appeals.

# Discussion and Decision

Where, as here, the trial court enters special findings and conclusions pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review.[3] *Barton v. Barton*, 47 N.E.3d 368, 373 (Ind. Ct. App. 2015), *trans. denied*. We determine first if the evidence supports the findings and second whether the findings support the judgment. *Id.* The trial court's findings and conclusions will be set aside only if clearly erroneous. *Id.* We neither reweigh the evidence nor reassess witness credibility. *Id.* Instead, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them. *Id.*

## I. Property in the Marital Pot

Husband first contends that the trial court erred when it included the entire $150,000 payment DBConnect received in December 2014 in the marital pot. It is well settled that in a dissolution action, all marital property, whether owned by either spouse before the marriage, acquired by either spouse after the marriage and before final separation of the parties, or acquired by their joint efforts, goes into the marital pot for division. Ind. Code § 31-15-7-4(a); *Falatovics v. Falatovics*, 15 N.E.3d 108, 110 (Ind. Ct. App. 2014). The date of

---

[3] To the extent Husband argues that the trial court accepted verbatim Wife's proposed findings, and therefore erred in failing to properly scrutinize Wife's proposed findings and conclusions, he is mistaken. Here, the trial court did not accept verbatim Wife's proposed findings. Rather, as Husband acknowledges, only seventeen of the trial court's seventy-five findings and conclusions were adopted from Wife's proposed findings and conclusions. *See* Appellant's Br. p. 24. Furthermore, the trial court made numerous changes to the seventeen findings and conclusions it adopted from Wife, and presumably scrutinized the findings and conclusions in doing so. We therefore find no error.

"final separation" is the date the petition for dissolution is filed. Ind. Code § 31-9-2-46. "The requirement that all marital assets be placed in the marital pot is meant to insure that the trial court first determines that value before endeavoring to divide property." *Montgomery v. Faust*, 910 N.E.2d 234, 238 (Ind. Ct. App. 2009). "Indiana's 'one pot' theory prohibits the exclusion of any asset in which a party has a vested interest from the scope of the trial court's power to divide and award." *Falatovics*, 15 N.E.3d at 110 (quotation omitted). While the trial court may decide to award a particular asset solely to one spouse as part of its just and reasonable property division, it must first include the asset in its consideration of the marital estate to be divided. *Id.*

[18] In general, then, any property in which a party has a vested interest on the date the petition for dissolution is filed is subject to division, and property acquired after the final separation date should not be included in the marital pot. *Fischer v. Fischer*, 68 N.E.3d 603, 608-09 (Ind. Ct. App. 2017), *trans. denied*. Whether a right to a present or future benefit constitutes an asset that should be included in the marital pot depends mainly on whether it has "vested" by the time of dissolution. *Ford v. Ford*, 953 N.E.2d 1137, 1142 (Ind. Ct. App. 2011). That is, "vesting is both a necessary and sufficient condition for a right to a benefit to constitute an asset." *Id.* (quoting *Bingley v. Bingley*, 935 N.E.2d 152, 154 (Ind. 2010)). There are two ways in which a right to a benefit can vest: (1) vesting in possession or (2) vesting in interest. *Id.* Vesting in possession connotes an immediately existing right of present enjoyment, while vesting in interest implies a presently fixed right to future enjoyment. *Id.*; *see also In re Marriage of*

*Preston*, 704 N.E.2d 1093, 1097 (Ind. Ct. App. 1999)). Here, Husband asserts that DBConnect's right to $88,625.00 of the $150,000 payment had not vested because its "interest in the $88,625.00 prepayment was in fact contingent upon [its] duty to perform the services outlined in the service agreement." Appellant's Br. p. 41.

[19] Husband misunderstands the law. While we agree that the evidence does not show that DBConnect's right to the entire $150,000 payment was vested in interest, the evidence does show that DBConnect's right to the entire $150,000 payment was vested in possession. That is, once DBConnect received the $150,000 payment, it had "an immediately existing right of present enjoyment." *Ford*, 953 N.E.2d at 1142. This right to the entire $150,000 payment was illustrated by DBConnect's unrestricted treatment of these funds. First, we note that DBConnect did not establish a second (i.e., escrow) account to hold the $150,000 payment, against which DBConnect would bill as it completed work to pay itself; instead, DBConnect deposited the entire $150,000 payment into its checking account. *See* Tr. Vol. I p. 122; *see also* Ex. Y. Next, after DBConnect deposited the entire $150,000 payment into its account, it wrote two checks (one for $41,250 and the other for $52,000) to fund its two employees' SEP-IRAs. While Husband contended that DBConnect would have had enough money in its account to fund its employees' SEP-IRAs without the $150,000 payment, a brief glance at DBConnect's account balance before the $150,000 payment was received ($74,206.35) compared to DBConnect's account balance after the $150,000 payment was received ($224,191.35) clearly shows that

DBConnect **would not** have had enough in its account to contribute $93,250 to its employees' SEP-IRAs without the $150,000 payment. *See* Tr. Vol. I p. 152; *see also* Tr. Vol. II p. 4; Ex. Y. Furthermore, as Husband concedes, DBConnect did not recognize the $150,000 "payment as income as it [was] earned" but instead, chose to recognize the entire $150,000 payment as income on its 2014 profit-and-loss statement and 2014 tax return. Appellant's Br. p. 40; *see also* Exs. L, W. Finally, there was no provision in the contract between DBConnect and the customer stating how monies from the $150,000 payment would be repaid if work was not completed. *See* Ex. 33. The evidence shows that DBConnect had an immediately existing right of present enjoyment to the entire $150,000 payment and therefore it was vested in possession on the date the petition for dissolution was filed. Because DBConnect's interest in the entire $150,000 payment had vested, the trial court properly included the entire $150,000 payment in the marital pot.

## II. Valuation of Marital Assets

[20] Husband next challenges the trial court's valuation of several marital assets. A trial court's decision in ascertaining the value of property in a dissolution action is reviewed for an abuse of discretion. *Del Priore v. Del Priore*, 65 N.E.3d 1065, 1076 (Ind. Ct. App. 2016), *trans. denied*. Generally, there is no abuse of discretion if a trial court's chosen valuation is within the range of values supported by the evidence. *Id*. "A valuation submitted by one of the parties is competent evidence of the value of property in a dissolution action and may alone support the trial court's determination in that regard." *Id*. (citing

*Alexander v. Alexander*, 927 N.E.2d 926, 935 (Ind. Ct. App. 2010), *trans. denied*.)
When we review a trial court's valuation of property in a dissolution, we will
neither reweigh the evidence nor judge the credibility of witnesses. *Id*. at 1076-
77.

## a. Greythorne

First, Husband challenges the trial court's valuation of Greythorne. The trial
court calculated the value of Greythorne by starting with its fair market value
and then deducting the costs of the sale and marketing of the house and the
mortgage payoff. In other words, $478,000 (fair market value) minus
$29,422.45 (costs of sale and marketing) minus $393,529.93 (mortgage payoff)
equals $55,047.62. Appellant's App. Vol. II p. 192 (Findings 31 & 32). On
appeal, Husband argues that the trial court "arbitrarily assign[ed] selling costs
of $29,422.45" instead of $33,422, which Husband alleges are the actual closing
costs. Appellant's Br. p. 27. In support of his argument, Husband cites the
Seller's Settlement Statement, Ex. TT, which he alleges "clearly articulates the
closing costs of the property of $33,422," Appellant's Reply Br. p. 7. It is true
that the Seller's Settlement Statement shows $4000 in "Earnest Money Held By:
Century 21 Bradley Realty Inc." listed in the seller's "debit" column. Ex. TT.
But to the extent that Husband's argument is that anything listed in the seller's
"debit" column on the Seller's Settlement Statement was a "cost" he bore, we
fail to see how earnest money paid by the buyer would constitute a "cost" to
Husband. In his briefs, Husband does not explain why the $4000 in earnest
money paid by the buyer is a "cost" to him and relies exclusively on the Seller's

Settlement Statement's placement of the $4000 in earnest money in the "debit" column. Without providing further explanation, Husband has not shown why $4000 in earnest money paid by the buyer is a "cost" to him, and therefore, we see no abuse of discretion in the trial court's valuation of Greythorne.

## b. DBConnect

Next, Husband challenges the trial court's valuation of DBConnect.[4] Appellant's App. Vol. II p. 193 (Finding 34). Specifically, Husband argues that the evidence does not support the trial court's valuation of DBConnect's short-term investment account and payroll liabilities. *See* Appellant's Br. pp. 29, 32.

During the final dissolution hearing, Husband and Wife both put forth evidence pertaining to the value of DBConnect's short-term investment account funded almost entirely with Cyclone, an "over-the-counter stock." Wife called Houlihan, a certified valuation analyst, who, after reviewing how DBConnect valued the short-term investment account on its tax returns and balance sheets, assigned a value to the investment account of $29,995. *See* Tr. Vol. I p. 236; *see also* Exs. 24, D, E, F, G, H, U, V, W, X. Husband disagreed with Houlihan's valuation of DBConnect's short-term investment account and contended that

---

[4] Husband also contends that the trial court used a valuation date that was after the date the dissolution petition was filed on March 5, 2015. Appellant's Br. pp. 32-33. We disagree. The trial court heard testimony from Houlihan that he used a balance sheet from March 28, 2015, and an income statement from January to April 2015 to "retrace back" what DBConnect's value would have been on March 5, 2015. Tr. Vol. I pp. 235-36. The trial court found Houlihan's testimony to be credible and therefore adopted his valuation of DBConnect. *See* Appellant's App. Vol. II p. 42. On appeal, we do not reweigh the evidence or assess witness credibility. *Fischer*, 68 N.E.3d at 608. Accordingly, we cannot say that the trial court abused its discretion.

the market value of the investment account was "maybe two dollars." Tr. Vol. I p. 236. However, Wife's other expert, James, testified that the fair market value of investments in over-the-counter stocks, such as Cyclone, are difficult to determine because their sales are not reported, and that a quoted value may not represent the actual value of the investment if sold. *See* Tr. Vol. II p. 53. On appeal, Husband states that he does not "take issue with [Houlihan's] general methodology, as it is generally sound" and instead argues that the trial court erred by adopting Houlihan's valuation, which relied on DBConnect's balance sheets valuing its short-term investment account at cost, as opposed to adopting Husband's valuation, which relied on an exhibit that allegedly showed the "value of the short-term investment as of the date of filing" was $31.99. Appellant's Br. pp. 27, 29; Appellant's Reply Br. p. 9. First, the trial court's valuation of DBConnect's short-term investment account was within the range of values supported by the evidence. *See Del Priore*, 65 N.E.3d at 1076. Next, insofar as Husband's argument is that the trial court should have calculated the value of DBConnect's short-term investment account one way as opposed to another, the trial court has discretion to determine the value of marital assets. As such, the trial court did not abuse its discretion by choosing to adopt Houlihan's method of valuing DBConnect's short-term investment account instead of Husband's.

[24] Husband's second challenge to the trial court's valuation of DBConnect involves its payroll liabilities. At the outset, we note that the value of DBConnect was disputed throughout the final dissolution hearing, but Husband

did not contest its valuation with respect to payroll liabilities until filing his motion to correct error, which the trial court denied. We review a trial court's denial of a motion to correct error for an abuse of discretion. *Scales v. Scales*, 891 N.E.2d 1116, 1118 (Ind. Ct. App. 2008). An abuse of discretion occurs where the trial court's decision is against the logic and effect of the facts and circumstances before it or if the court has misinterpreted the law. *Id*. Specifically, Husband's motion to correct error sought to admit allegedly newly discovered evidence regarding DBConnect's payroll liabilities. Appellant's App. Vol. II p. 152. Newly discovered evidence is "material evidence . . . which, with reasonable diligence, could not have been discovered and produced at trial." Ind. Trial Rule 59(A)(1). To prevail on a motion to correct error based on newly discovered evidence, a party must:

> demonstrate that the evidence could not have been discovered and produced at trial with reasonable diligence; that the evidence is material, relevant, and not merely cumulative or impeaching; that the evidence is not incompetent; that he exercised due diligence to discover the evidence in time for the final hearing; that the evidence is worthy of credit; and, that the evidence raises the strong presumption that a different result would have been reached upon retrial.

*Scales*, 891 N.E.2d at 1120 (citing *Matzat v. Matzat*, 854 N.E.2d 918, 920 (Ind. Ct. App. 2006)). During the final dissolution hearing, Houlihan testified that he accounted for both "payroll tax liabilities" and "payroll liabilities" when he valued DBConnect. Tr. Vol. I pp. 235, 237. Then, after the trial court issued its dissolution decree relying on Houlihan's testimony to value DBConnect,

Husband filed a motion to correct error seeking to admit two pieces of allegedly newly discovered evidence: (1) an affidavit that Husband prepared and signed alleging that DBConnect had "accrued payroll" and "payroll taxes" totaling $17,600.41 and "accrued vacation pay" totaling $17,600.41; and (2) DBConnect's two employees' paystubs that were issued on March 20, 2015. Appellant's App. Vol. II pp. 169, 171-172. On appeal, Husband does not argue that he did not have access to DBConnect's payroll information before the final hearing and, to be sure, the evidence shows that Husband had ample access to his own company's records. First, we will not allow Husband to circumvent the trial rules because he failed to get evidence of his own company's payroll liabilities before the final hearing. Therefore, because Husband failed to demonstrate that he made a reasonably diligent effort to obtain information regarding DBConnect's payroll liabilities before the final hearing, we find that the trial court acted within its discretion in denying Husband's motion to correct error. Next, regarding Husband's argument that the trial court excluded accrued payroll and accrued vacation pay in valuing DBConnect, we disagree. The evidence shows that Wife's expert, Houlihan, testified that he accounted for "payroll tax liabilities" and "payroll liabilities" when calculating the value of DBConnect. Tr. Vol. I pp. 235, 237. In adopting Houlihan's valuation of DBConnect, the trial court therefore adopted a valuation of DBConnect that accounted for payroll liabilities. Accordingly, the trial court did not abuse its discretion in valuing DBConnect.

# III. Attorney's Fees

[25] Husband next contends that the trial court abused its discretion in ordering him to pay $84,500 of Wife's attorney's fees because the most he should have had to pay is $72,000. Appellant's Reply Br. p. 14. Pursuant to Indiana Code section 31-15-10-1, a trial court may order a party in a dissolution proceeding to pay a reasonable amount of the other party's attorney's fees. *Barton*, 47 N.E.3d at 377. In determining whether to award attorney's fees in a dissolution proceeding, trial courts should consider the parties' resources, their economic condition, their ability to engage in gainful employment and earn income, and other factors being on the reasonableness of the award. *Id*. A party's misconduct that directly results in additional litigation expenses may also be considered. *Id*. The trial court has broad discretion in awarding attorney's fees. *Del Priore*, 65 N.E.3d at 1079. We will only reverse where the trial court's award is clearly against the logic and effect of the facts and circumstances before the court. *Id*.

[26] At the final dissolution hearing, Wife's attorney testified that in the divorce case, the costs of his legal services, including post-trial work, were $97,930.75 and litigation expenses were $8327.10. Tr. Vol. II p. 96. Wife's attorney also testified that in the guardianship case, he had billed $29,768.25 for his legal services and $205 for litigation expenses. *Id*. at 97. Wife's attorney provided the timekeeping and billing statements for both cases. *See* Exs. HHH, III. Wife's attorney stated that the timekeeping and billing statements did not reflect what he had been paid in each case but testified that he had been paid "just

under $33,500" for both cases and had allocated the "greater portion of that [money] to the guardianship case." Tr. Vol. II p. 99. First, Husband alleges that Wife's attorney did not comply with Allen County's Family Law Attorney Fees local rule. The rule states:

> (1) All requests for attorney fees shall be presented to the Court by way of affidavit or oral testimony, as the Court allows. The affidavit shall be admitted into evidence subject to cross-examination. In addition, the affidavit shall have attached to it a billing statement which includes an itemization of services, the total fee for the services, payments received for the services, and the account balance.

LR02-FL00-718. Husband argues that "Wife's attorney did not provide evidence of payments received or the account balance" on the timekeeping and billing statement for the divorce case. Appellant's Br. p. 43. Although the timekeeping and billing statement did not show the payments Wife's attorney received in the divorce case, Wife's attorney testified about the payments he had received. Wife's attorney's testimony along with the timekeeping and billing statement for the divorce case are enough to satisfy Allen County's local rule. Next, Husband seems to argue that even if Wife's attorney's testimony along with the timekeeping and billing statement for the divorce case satisfies the local rule, Wife's attorney is not credible because the timekeeping and billing statement for the divorce case "contains a minimum of 17 errors." Appellant's Reply Br. p. 14. To the extent that Husband tries to undercut Wife's attorney's testimony by stating that he identified seventeen accounting errors in the timekeeping and billing statement for the divorce case, that is a

credibility issue that we do not address on appeal. *See Barton*, 47 N.E.3d at 377. Given the evidence showing the extreme disparity in Husband's income as compared to Wife's along with the evidence showing that Husband's litigation strategy caused an increase in Wife's attorney's fees, the trial court did not abuse its discretion in ordering Husband to pay $84,500 of Wife's attorney's fees.[5]

## IV. Provisional Payments

[27]    Husband asserts that "the trial court abused its discretion by failing to credit, or even to consider crediting, [him] for $51,900 in provisional payments he made to Wife through the date of the final hearing." Appellant's Br. p. 55. A provisional order is designed to maintain the status quo of the parties. *Mosley v.*

---

[5] Husband also argues that one of the trial court's findings is not supported by the evidence. In its dissolution decree, the trial court found that:

> 48. Contemporaneous with bringing the dissolution action, [Husband] filed suit in the Probate Division of this Court to remove [Wife] as the Guardian of the person and estate of her profoundly disabled, biological daughter, [J.K.]. In addition to the Complaint/Petition, the Court notes that the final Order in that matter in evidence, wherein [Wife] remains as the child's Guardian, but not, given other evidence, at no cost. That is, among her financial circumstances at the time the Decree is to be entered is a debt of over $30,000.00 in attorney fees and related expenses occasioned by dealing with [Husband's] lawsuit.

Appellant's App. Vol. II p. 197 (Finding 48). Husband contends that because Wife's attorney testified that he had been paid $33,500 and that he had allocated most of that money to the guardianship case, Wife could not have had a debt of over $30,000 related to the guardianship case. While Husband's literal reading of this finding is technically correct, we believe that is not what the trial court meant. Rather, a common-sense reading of this finding, in its context, suggests that the trial court meant to point out that Wife incurred a debt of over $30,000 in attorney's fees and expenses to retain guardianship of her own daughter. Nonetheless, the amount of attorney's fees awarded to Wife is supported by the evidence of the parties' income disparity and the evidence showing that Husband's litigation tactics increased Wife's attorney's fees.

*Mosley*, 906 N.E.2d 928, 929 (Ind. Ct. App. 2009). The determination of temporary orders in a dissolution proceeding is committed to the sound discretion of the trial court, and it can issue orders for temporary maintenance or support, temporary restraining orders, custody orders, and orders for possession of property to the extent it deems just and proper. Ind. Code § 31-15-4-8. A provisional order is temporary in nature and terminates when the final dissolution decree is entered or the petition for dissolution is dismissed. Ind. Code § 31-15-4-14. Any disparity or inequity in a provisional order can and should be adjusted in the trial court's final order. *Mosley*, 906 N.E.2d at 930. On appeal, we will consider only the evidence most favorable to the trial court's decision. *Id*. We will reverse only where the decision is clearly against the logic and effect of the facts and circumstances before the court. *Id*.

[28] Here, the evidence shows that the trial court "considered the effect of its Provisional Orders" and "adjusted the attorney fee Order accordingly, but d[id] not find that additional credits (to [Husband]) [were] due." Appellant's App. Vol. II p. 202 (Finding 72). As such, the evidence does not support Husband's assertion that the trial court failed "even to consider" the provisional payments he made to Wife. Next, Husband argues that "[t]o the extent that Wife used provisional payments" to pay her attorney, Husband is "**entitled** to . . . a provisional offset."[6] Appellant's Reply Br. p. 15 (emphasis added). However,

---

[6] Husband also argues that the amount of attorney's fees awarded to Wife must be reduced by the amount of provisional payments he made to Wife because Wife may have used money from the provisional payments to

Husband does not cite any legal authority that supports such an entitlement. Accordingly, we conclude that the trial court did not abuse its discretion by declining to reduce the equalization payment owed to Wife by the amount of provisional payments made by Husband during dissolution.

Affirmed.

Riley, J., and Kirsch, J., concur.

---

pay for any attorney in the guardianship case. But Husband fails to cite any legal authority to support this argument.